*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 06a0278p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

WILLIAM H. MALOOF,

    *Petitioner-Appellant,*

  *v.*

No. 05-1967

COMMISSIONER OF INTERNAL REVENUE,

    *Respondent-Appellee.*

>

Appeal from the Decision of the
United States Tax Court.
Nos. 02-15211; 03-17951.

Argued: May 31, 2006

Decided and Filed: August 4, 2006

Before: GILMAN, SUTTON, and COOK, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Donald J. O'Connor, Cleveland, Ohio, for Appellant. Michelle B. Smalling, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Donald J. O'Connor, Colleen A. O'Connor, Cleveland, Ohio, for Appellant. Michelle B. Smalling, Teresa E. McLaughlin, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

_____

## OPINION

_____

  SUTTON, Circuit Judge. In filing a series of individual tax returns in the 1990s, William Maloof claimed significant deductions for losses incurred by S corporations that he owned. Under 26 U.S.C. § 1366(d)(1), Maloof's deductions from these losses could not exceed his basis in the stock or debt of the corporations. Recognizing that the losses greatly exceeded his initial investment in the corporations, Maloof claimed that a $4 million bank loan to the corporations in 1993, on which Maloof was a co-obligor and guarantor, permissibly increased his basis in debt of the S corporation to the shareholder (or possibly stock of the S corporation owned by the shareholder). *See id*. The relevant statutes and case law, however, permit an increase in basis in debt (or stock) only when the taxpayer makes an economic outlay to the corporation, and Maloof's status as a co-obligor on the loan established just the possibility, not the reality, of an economic outlay for the corporation. We therefore affirm the decision of the Tax Court upholding over $3 million in tax deficiencies issued by the Internal Revenue Service against Maloof.

1

I.

Maloof owns several S corporations, including Level Propane, Park Place Management, Park Place, Inc. and Neptune Propane, Inc. When Level Propane experienced capital problems in 1993, the S corporations together borrowed $4 million from Provident Bank. Under the loan documents, the S corporations "are collectively referred to as the 'Borrower,'" and the bank received a security interest in the equipment of the S corporations that the loan proceeds purchased, their inventory and accounts receivable as well as in some of Level Propane's other assets. Maloof agreed to be a co-obligor on the loan and guaranteed the loan by granting the bank a security interest in a $1 million life insurance policy on his life and in all of his stock in the S corporations. The loan makes him jointly and severally liable for the debt.

The S corporations made monthly interest payments on the loan through an account maintained with Provident Bank. In early 2002, the corporations failed to keep up with the monthly payments, defaulted on the loan and entered involuntary bankruptcy. At no point did the bank sue Maloof as a co-obligor, take possession of his security interest or for that matter ever receive a payment from Maloof for the loan.

Relying on the losses incurred by his companies before the bankruptcy and on the pass-through taxation rules that apply to S corporations, Maloof claimed significant deductions on his personal tax returns during the 1990s. In an effort to take advantage of the tax benefits from these losses, Maloof claimed an increased basis in the debt (or possibly stock) of the S corporations based on the $4 million loan from Provident Bank. In 2002 and 2003, however, the IRS issued notices of deficiency to Maloof for over $3 million for taking impermissible deductions on his individual tax returns for various tax years between 1990 and 2000, contending that Maloof could not premise an increase in basis on the Provident Bank loan.

The Tax Court upheld the IRS's deficiency ruling. Citing court of appeals precedent and precedent of its own, the Tax Court concluded that "[a] taxpayer must make an economic outlay for a loan to create basis," Tax Ct. Op. at 7, and that "[s]hareholder guaranties of loans to an S corporation do not constitute an economic outlay," *id*. at 8. The court also concluded that "pledging personal assets" or stock does not by itself increase the basis in debt (or stock) and refused to look at what Maloof maintained was the substance of the loan transaction (a loan to him from the bank) as opposed to its form (a loan to the S corporations from the bank). *Id*. at 10.

II.

Two features of the tax laws governing S corporations set the stage for resolving this appeal. First, unlike a traditional C corporation, S corporations themselves generally do not pay taxes. *See Gitlitz v. Comm'r*, 531 U.S. 206, 214 n.6 (2001) ("The very purpose of Subchapter S is to tax at the shareholder level, not the corporate level. Income is determined at the S corporation level . . . not in order to tax the corporation . . . but solely to pass through to the S corporation's shareholders the corporation's income."). Each shareholder of an S corporation thus pays taxes at individual rates on the pro rata share of the corporation's income (if there is any) and receives the pro rata tax benefits (*e.g.*, losses, deductions and credits) of the corporation. *See* 26 U.S.C. § 1366(a)(1). Consistent with this "pass-through system" of taxation, the S corporation's income and losses become the individual shareholder's income and losses. *See Bufferd v. Comm'r*, 506 U.S. 523, 525 (1993) ("The statute accomplishes these goals by means of a pass-through system under which corporate income, losses, deductions, and credits are attributed to individual shareholders in a manner akin to the tax treatment of partnerships.").

Second, the Internal Revenue Code places a limitation on the pass-through loss deductions that an individual may take on his tax return. The deductions "[c]annot exceed [the] shareholder's basis in stock and debt." 26 U.S.C. § 1366(d)(1).

The question, then, is whether Maloof properly increased his basis in stock or debt when he became a co-obligor and guarantor of the Provident Bank loan. If he did, if his basis in the corporations' stock or debt increased by $4 million after the July 1993 loan, then that would defeat some, though apparently not all, of the deficiencies charged by the IRS. *See* Tax Ct. Op. at 4 n.3. If he did not, then the Tax Court properly upheld the IRS's deficiencies.

*The statutory language.* The relevant statutory language undermines Maloof's argument. It provides:

(d) Special rules for losses and deductions.

(1) Cannot exceed shareholder's basis in stock and debt. The aggregate amount of losses and deductions taken into account by a shareholder under subsection (a) for any taxable year shall not exceed the sum of—

(A) the adjusted basis of the shareholder's stock in the S corporation (determined with regard to paragraphs (1) and (2)(A) of section 1367(a) for the taxable year), and

(B) the shareholder's adjusted basis of *any indebtedness of the S corporation to the shareholder* (determined without regard to any adjustment under paragraph (2) of section 1367(b) for the taxable year).

26 U.S.C. § 1366(d) (emphasis added).

In accordance with this pass-through limitation, a taxpayer may use S corporation losses and deductions in completing his individual tax return so long as they do not "exceed the sum of" (1) "the adjusted basis of the shareholder's stock in the S corporation" and (2) "the shareholder's adjusted basis of any indebtedness of the S corporation to the shareholder." The former method for adjusting a shareholder's basis in stock turns on the corporation's income-loss performance in a given year as well as on whether the shareholder has made any capital contributions to the corporation. *See* William Meade Fletcher, 14A Fletcher Cyclopedia of the Law of Private Corporations § 6970.205 (p. 524) (West 2000) ("A shareholder's basis in the stock of an S corporation is subject to adjustment from year to year . . . . Generally, the adjusted basis of S corporation stock is increased by income passed through to the shareholder and is decreased by losses and deductions passed through to the shareholder. The adjusted basis in S corporation stock cannot decrease below zero as a result of these adjustments."); *id.* § 6970.205 (p. 525) ("The basis of an S corporation shareholder in the stock of the corporation may also be increased by capital contributions made to the corporation."); 26 C.F.R. §1.118-1 (explaining that capital contributions to an S corporation represent "an additional price paid for[] the shares of stock held by the individual shareholders"). The latter method turns on whether the shareholder has lent money to the S corporation.

It is far from clear which provision Maloof invokes in claiming a right to pass losses of the S corporation through to his individual tax returns. Neither his appellate papers nor the decision below clarifies that he is pursuing one route to the exclusion of the other. That he relies on a guarantee with respect to the Provident Bank *debt* would suggest that he seeks to establish basis in debt. And with respect to the possibility that he means to argue that he increased his basis in his stock, he never says that the guarantee of the Provident Bank loan amounted to a *capital*

*contribution*.  One, of course, must be a shareholder to have any pass-through rights at all in this area, so a stray reference in his papers to increasing his basis in stock—without explaining that the loan guarantee amounted to a capital contribution—hardly shows that he has picked this route of basis aggregation over the other.  Under these circumstances, while it appears that Maloof means to argue that the loan established basis in debt, we will consider (in the interest of completeness) the possibility that the loan increased his basis in debt or stock.

With respect to debt, the statute requires Maloof to show that the Provident Bank loan created "indebtedness of the S corporation to the shareholder."  26 U.S.C. § 1366(d)(1)(B).  As we read these words, they do more harm than good to Maloof's position because it is difficult to say that the Provident Bank loan created "indebtedness *of the S corporation to the shareholder*."  Under the $4 million loan agreement, the S corporations were the "borrowers," and the bank was the lender.  The statute by its terms limits Maloof's deductions to what the company owes *him* ("indebtedness of the S corporation to the shareholder"), and not surprisingly the document memorializing the loan indicates that the corporations owe $4 million to *the bank*.  *See, e.g*., JA 122 (Loan agreement § 2.4) ("All payments of interest under the Demand Note shall be made by Borrowers to Bank simultaneously on the first day of each month . . . .  All payments of principal and interest on the Equipment Notes and Revolving Credit Notes and all other sums due thereunder, shall be likewise paid . . . .").

That Maloof cosigned the loan and that he could one day be asked to pay it does not by itself alter this conclusion because until that contingency transpired the S corporations remained indebted to the bank, not to Maloof.  *See, e.g*., JA 123 (Loan agreement § 3.1) ("Borrower agrees to pay Bank interest on the unpaid principal balance outstanding from time to time on the Demand Loan . . . .").  Had Provident exercised its option to obtain recourse against Maloof, the corporations no doubt would have become indebted to Maloof, giving Maloof the proverbial bitter (depriving him of up to $4 million in personal assets) with the sweet (increasing his basis in S corporation debt by up to $4 million).  But for the tax years in question, Provident did no such thing.  Maloof admits that he has never made a loan payment, whether interest or principal, and the bank has never seized the collateral he made available to guarantee the loan.  See Tax Ct. Op. at 4.

With respect to stock, the shareholder's basis in his stock begins with the initial price he paid for the stock or with the initial capital contribution he made in return for the stock.  *See* 26 U.S.C. § 1012 (defining basis in property as "the cost of such property").  And there is no reason to think that later capital contributions may not increase the shareholder's basis in his stock.  The problem here is that Maloof has done nothing to show, and indeed has not even argued, that by guaranteeing the Provident Bank loan he made a "capital contribution" to the company.  For many of the same reasons that he cannot show that the corporation became indebted to him, he cannot show that his guarantee amounted to a capital contribution—at least until the bank sought recourse on the guarantee.

*Tax Court precedent.*  The decisions of the Tax Court also undermine Maloof's argument.  In 1970, in interpreting the (materially indistinguishable) predecessor statute to § 1366, *see* 26 U.S.C. § 1374(c)(2)(B) (1982), the Tax Court concluded that a taxpayer must make an "economic outlay" in order to increase his basis in S corporation debt (or stock) under this provision.  *Perry v. Comm'r*, 54 T.C. 1293, 1296 (1970); *see Pike v. Commissioner*, 78 T.C. 822, 839–40 (1982) (noting that the economic-outlay doctrine applies whether the court is considering a shareholder's alleged basis in stock or debt).  Before the taxpayer may increase his basis, the court noted, "there must have occurred some transaction which when fully consummated left the taxpayer poorer in a material sense."  *Perry*, 54 T.C. at 1296 (internal quotation marks omitted).  Since *Perry*, "economic outlay" has been the coin of the realm when it comes to assessing whether a transaction increases a taxpayer's basis, and the Tax Court consistently has concluded that a taxpayer guarantor does not make an economic outlay until required to honor the guarantee.  *See Underwood v. Comm'r*, 63 T.C.

468, 476 (1975) ("[I]t is the payment by the guarantor of the guaranteed obligation that gives rise to indebtedness on the part of the debtor to the guarantor. The mere fact that the debtor defaults and thereby renders the guarantor liable is not sufficient. . . . The adjusted basis for indebtedness referred to in [the predecessor statute] is . . . limited to 'the actual economic outlay of the shareholder.'") (citing *Perry*, 54 T.C. at 1296); *see also Spencer v. Comm'r*, 110 T.C. 62, 78–79 (1998) (applying the "economic outlay" standard to 26 U.S.C. § 1366(d)).

*Court of Appeals precedent*. The courts of appeals have followed suit, as every circuit to consider the issue, including this one, has upheld the Tax Court's use of the "economic outlay" standard—whether in the context of increasing the shareholder's basis in debt or stock of the S corporation. *See Sleiman v. Comm'r*, 187 F.3d 1352, 1357 (11th Cir. 1999); *Bergman v. United States*, 174 F.3d 928, 932 (8th Cir. 1999); *Uri v. Comm'r*, 949 F.2d 371, 373 (10th Cir. 1991); *Harris v. Comm'r*, 902 F.2d 439, 443 (5th Cir. 1990); *Estate of Leavitt v. Comm'r*, 875 F.2d 420, 422 (4th Cir. 1989); *Brown v. Comm'r*, 706 F.2d 755, 757 (6th Cir. 1983).

In applying the "economic outlay" doctrine, the appellate courts have been nearly unanimous in concluding that when a shareholder guarantees a loan, the existence of the guarantee does not by itself increase the indebtedness of the S corporation to the shareholder. *Estate of Bean v. Comm'r*, 268 F.3d 553, 558 (8th Cir. 2001) ("[A] mere guaranty of a corporate loan is insufficient to give [shareholders] basis for the amount of the loan . . . ."); *Reser v. Comm'r*, 112 F.3d 1258, 1264 (5th Cir. 1997) ("[C]ourts have consistently held that when a shareholder personally guarantees a debt of his S corporation, he may not increase his adjusted basis in the corporation's indebtedness to him unless he makes an economic outlay by satisfying at least a portion of the guaranteed debt."); *see also Uri*, 949 F.2d at 373 (concluding that a "personal guarantee" was insufficient to increase "petitioners' basis in the corporation's stock" because it was not a "contribution[] of cash or other property"); *Leavitt*, 875 F.2d at 422 ("A guarantee, in and of itself, cannot fulfill that requirement. The guarantee is merely a promise to pay in the future if certain unfortunate events should occur."); *Brown*, 706 F.2d at 756 ("[T]he courts have consistently required some economic outlay by the guarantor in order to convert a mere loan guaranty into an investment.").

The courts likewise have held that a security interest on a shareholder's property by itself does not establish an economic outlay. *See Bean*, 268 F.3d at 559 ("We agree with the Fifth Circuit that a shareholder's pledge of personally owned property, without more, is not an economic outlay and is insufficient to create basis in the S corporation."); *see also Harris*, 902 F.2d at 445 ("In the same light, Harris' pledge to Hibernia of some $335,000 in certificates of deposit . . . does not provide such an outlay."). Consistent with these precedents and the reasoning behind them, Maloof's guarantee and his pledge of his assets to the bank, without more, did not establish an economic outlay or otherwise establish "indebtedness of the S corporation to the shareholder." 26 U.S.C. § 1366(d)(1)(B). And that is true whether Maloof means to argue that his loan guarantee increased his basis in debt or stock. *Compare Bergman*, 174 F.3d at 932–33 (applying the economic-outlay requirement to an S corporation shareholder's efforts to increase his basis in the debt of the corporation) to *Leavitt*, 875 F.2d at 422 (applying the economic outlay requirement to an S corporation shareholder's efforts to increase his basis in the stock of the corporation).

In challenging this conclusion, Maloof does not dispute the existence of the economic-outlay doctrine or its fidelity to the language of § 1366(d)(1). He argues instead that, in applying the doctrine, we should follow the path charted by *Selfe v. United States*, 778 F.2d 769, 774 (11th Cir. 1985), which held that a shareholder's loan guarantee amounted to an economic outlay. But even on its own terms, *Selfe*'s guarantee analysis does not support Maloof's guarantee efforts here. In applying the economic-outlay doctrine in that case, the Eleventh Circuit reasoned that the bank was "look[ing] to the shareholder as the primary obligor." *Id*. at 774. By contrast, no evidence in this case shows that the bank primarily looked to Maloof for repayment of the $4 million loan. To the contrary: Maloof did not pay any interest on the loan and the bank did not seek any interest (or

principal) from him, even after the corporations defaulted on the loan and entered involuntary bankruptcy.

The Eleventh Circuit, notably, has limited *Selfe* along these lines, reasoning that loan guarantees that increase the basis of a shareholder in an S corporation turn on "unusual sets of facts"—facts showing that the true borrower was indeed the shareholder. *See Sleiman v. Comm'r*, 187 F.3d 1352, 1359 (11th Cir. 1999). *Sleiman* noted that the S Corporation in *Selfe* was poorly capitalized, was a long-shot venture and was run by a novice, all of which prompted the court to believe that the loan in truth had been made to the shareholder. *Id*. *Sleiman* suggested that such cases will be rare, *id.*, and, proving the point, *Selfe* continues to stand alone as a case in which a court permitted a loan guarantee by a shareholder of an S corporation to increase the basis of his debt or stock in the corporation.

Trying to shoehorn his loan guarantee into the *Selfe/Sleiman* exception, Maloof submits that the substance of the transaction shows that he, rather than the S corporations, borrowed the $4 million. But as a general rule, courts will deem the form of a transaction to reflect its substance. "[A] transaction," the Supreme Court has held, "is to be given its tax effect in accord with what actually occurred and not in accord with what might have occurred. . . . [W]hile a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not . . . and may not enjoy the benefit of some other route he might have chosen to follow but did not." *Don E. Williams Co. v. Comm'r*, 429 U.S. 569, 579–80 (1977) (internal quotation marks omitted); *see also Leavitt*, 875 F.2d at 423 ("Generally, taxpayers are liable for the tax consequences of the transaction they actually execute and may not reap the benefit of recasting the transaction into another one substantially different in economic effect that they might have made. They are bound by the form of their transaction and may not argue that the substance of their transaction triggers different tax consequences.") (internal quotation marks omitted); *Harris*, 902 F.2d at 443 ("Ordinarily, taxpayers are bound by the form of the transaction they have chosen; taxpayers may not in hindsight recast the transaction as one that they might have made in order to obtain tax advantages.").

Nor is there anything peculiar about this loan suggesting that the form of the transaction did not mirror its substance. The loan document says that Provident loaned money to the corporations, defined in the document as borrowers, and that Maloof provided a guarantee for the loans on top of the security interests the bank obtained in the corporations' (and some of Maloof's) assets.

Maloof's own tax position, moreover, proves that the form of this loan respects its substance. Were Maloof correct that the transaction involved a loan from the bank to him, he would escape one tax deficiency at the peril of creating another. For if his characterization of the transaction is accurate, it follows that the corporations' payment of the interest on the loans amounted to constructive dividends to Maloof, which he would have to report (but did not report) as income on his tax returns. *See Harris*, 902 F.2d at 444 ("[T]here is no indication that Taxpayers treated the loan as a personal one on their individual returns by reporting Harmar's interest payments to Hibernia as constructive dividend income."). Maloof, then, finds himself in a situation where the form of the transaction shows that the S corporations, not he, borrowed money from Provident Bank, and his own tax returns show that the substance of the transaction involved money borrowed by the corporations, not him. On this record, we cannot accept his perhaps understandable, but ultimately flawed, efforts to recharacterize the transaction.

Maloof, finally, argues that because he lived in Florida at the time he filed his petition in tax court, Eleventh Circuit precedent should control this appeal. *See* 26 U.S.C. § 7482(b)(1)(A) ("[Decisions of the United States tax court] may be reviewed by the United States court of appeals for the circuit in which is located . . . the legal residence of the petitioner."). That he volitionally filed this challenge to the Tax Court's decision in the Sixth Circuit, not the Eleventh Circuit, makes

this something of a bewildering argument. *Cf. id.* § 7482(b)(2) ("[S]uch decisions may be reviewed by any United States Court of Appeals which may be designated by the Secretary and the taxpayer by stipulation in writing."). But the argument is of no moment anyway. Given our analysis of *Selfe* and given the Eleventh Circuit's more recent decision in *Sleiman*, Maloof cannot show that the application of Eleventh Circuit precedent would make any difference to the outcome of this appeal.

III.

For these reasons, we affirm.