IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Income Tax

STARK FIRS MANAGEMENT INC, and )
MOHAMMED A. FARHOUD, shareholder, )
)
Plaintiffs, ) TC-MD 150474N
)
v. )
)
DEPARTMENT OF REVENUE, )
State of Oregon, )
)
Defendant. ) **FINAL DECISION**[1]

Plaintiffs appeal Defendant's Notice of Deficiency Assessment dated August 18, 2015,

for the 2012 tax year. A trial was held in the courtroom of the Oregon Tax Court on May 3,

2016, in Salem, Oregon. Aladdin Hiyasat, CPA, appeared on behalf of Plaintiffs. Plaintiff

Mohammed ("Moe") A. Farhoud (Farhoud), Osama Salti (Salti), and Marc Pearce (Pearce)

testified on behalf of Plaintiffs. Ling Cai (Cai) appeared and testified on behalf of Defendant.

Plaintiffs' Exhibits 1 through 10 and Defendant's Exhibits A through Q were received without

objection.

Plaintiffs offered an additional exhibit at trial. Defendant objected because the exhibit

was not timely exchanged under Tax Court Rule-Magistrate Division (TCR-MD) 12. The court

excluded the exhibit. At the start of trial, Plaintiffs requested that Pearce give telephone

testimony. Defendant objected and the court denied Plaintiffs' request because it was not timely

made under TCR 59 B, which requires a request for telephone testimony to be filed at least 30

days before trial unless the moving party shows good cause.

---

[1] This Final Decision incorporates without change the court's Decision, entered September 8, 2016. The court did not receive a statement of costs and disbursements within 14 days after its Decision was entered. *See* Tax Court Rule–Magistrate Division (TCR–MD) 16 C(1).

## I. STATEMENT OF FACTS

Farhoud testified that his business is purchasing and leasing apartment complexes. He testified that Stark Firs LP (SFLP) owns the properties and Stark Firs Management, Inc. (SFMI) collects the management fees from those properties. SFMI is an S-Corporation and Farhoud is its sole shareholder. (*See* Def's Ex K at 1.) SFLP is a limited partnership of which SFMI is the general partner and Farhoud is the limited partner. (*See* Def's Ex I at 1.) Farhoud testified that he owns 99 percent of SFLP.

A.      *SFMI Loan to Shareholder*

Farhoud testified that 2012 was one of the worst times in his life; he was divorcing, struggling financially, and worrying about losing his house. He testified that he borrowed money on an ongoing basis from SFMI due to his personal hardship; he did not take out a lump sum loan. Farhoud testified that, at the time he borrowed money from SFMI, he intended to repay it. He testified that he did not write a loan document with himself because he did not know that he needed any documentation.

Cai questioned Farhoud about a loan from Joseph Khouri (Khouri), for which Farhoud signed a Secured Promissory Note and Security Agreement. (*See* Ptf's Ex 9.) That loan was for $200,000, effective May 1, 2010, with the entire principal due May 1, 2013. (*Id.* at 1-2.) Farhoud agreed to pay annual interest of seven percent. (*Id*. at 1.) The note was secured by the Raintree Apartments. (*Id.* at 2, 7.) Farhoud testified that he documented the loan from Khouri because it was from a third party and the lender wanted documentation and security. The loan from Khouri is listed as a liability on SFMI's General Ledger as of December 31, 2012, with a balance of $174,000, and also on SFMI's 2012 Form 1120S. (Ptf's Ex 10 at 3-4.)

/ / /

SFMI's General Ledger and Balance Sheet reveal that, as of December 31, 2011, SFMI's current assets included a $547,346.44 loan to shareholder. (*See* Def's Ex L at 1.) Farhoud could not recall if he had ever issued notes for the loans prior to 2012, nor could he recall the purpose of the loans; he testified that they may have been for his personal expenses. As of December 31, 2012, SFMI's loan to shareholder had increased by $235,509 to $782,855.44. (*Id.*) The $235,509 loan to shareholder in 2012 was comprised of numerous purchases on SFMI's credit cards at grocery stores, clothing retailers, hotels, gyms, and other vendors. (*See id.* at 4-24.) There is no dispute that those purchases were for Farhoud's personal expenses.

Salti testified that he has been an enrolled agent certified by the IRS since 1992. He testified that he has significant experience preparing business returns. Salti testified that when he prepared SFMI's 2012 books and returns, he reviewed the expenses and "filtered out" the personal expenses that were not deductible. (*See* Def's Ex L.) He testified that the credit and debit charges for personal items were tallied up and reported as loans to shareholder. (*See id.*) Salti testified that there is no requirement for a written loan agreement and, according to the statute of frauds, no written contract is required if the contract is less than one year.

B.    *SFMI's and Farhoud's Returns*

On its 2011 Form 1120S, SFMI reported gross receipts of $679,759 and total deductions of $641,436, for ordinary business income of $38,323. (Def's Ex N at 3.) The 2011 Schedule L Balance Sheet reflected loans to shareholder totaling $586,624 at the beginning of the year and $547,346 at the end of the year. (*Id.* at 6.) On its 2012 Form 1120S, SFMI reported gross receipts of $805,300 and total deductions of $788,785, for ordinary business income of $16,677. (Def's Ex M at 3.) Both the 2011 and 2012 returns reported the loans to shareholders reflected on SFMI's books, although in 2012 the $235,509 loan was erroneously listed under "Other

current assets" rather than "Loans to shareholders" on SFMI's Schedule L. (Def's Ex M at 6, N at 6.) SFMI's 2012 Schedule L balance sheet reported other current liabilities of $312,692 at the end of the year, which were reportedly "Credit Cards." (Def's Ex M at 6, 13.) Neither the 2011 nor the 2012 return included any officer compensation or wages. (Def's Ex M at 3, N at 3.)

Salti testified that SFMI did not pay any officer compensation or wages in 2012 because Farhoud was struggling personally. Farhoud's 2012 personal income tax return reported adjusted gross income of $108,114 and taxable income of $73,414. (Def's Ex O at 5-6.) Farhoud testified that his businesses have rebounded since 2012.

C.    *Loan Repayments*

Farhoud testified that, in 2012, he tried to refinance a property owned by SFLP but he was unable to do so. He testified that he was able to refinance the property in 2013 and he used the funds to make a lump sum repayment of his loan to SFMI in October 2013. Pearce testified that he is the president of a business that arranges financing for commercial properties. He testified that Farhoud contacted him during the fourth quarter of 2012 regarding refinancing an apartment. Pearce testified that he and Farhoud initially sought to refinance with a lender who walked, so they had to start over with a second lender.

Pearce testified that escrow wired funds directly to SFMI's bank account at Farhoud's request. (*See* Ptf's Ex 8 at 3 (bank statement showing deposit of $303,859.14 in SFMI's account from a refinance).) Salti testified that Farhoud made that loan repayment to SFMI prior to the start of Defendant's audit in 2014. He testified that Farhoud generated more cash flow in 2013 by increasing rents and refinancing properties to achieve lower interest rates.

Plaintiffs provided a Borrower's Final Settlement Statement dated September 30, 2013, which identifies the borrower as SFLP. (Ptf's Ex 8 at 1; Def's Ex J at 1.) Salti acknowledged

that the borrower was SFLP, not Farhoud, but still considered it to be Farhoud's loan repayment. Pearce testified that, although SFLP was the borrower, Farhoud personally guaranteed the loan and could direct escrow where to send the money.

Cai testified that the supposed loan repayment was from a different entity, SFLP, not from Farhoud. She testified that the repayment should have been reported as a loan from SFLP to SFMI. At trial, the parties agreed that Farhoud could have distributed funds from SFLP to himself, which would have been a taxable event only if his basis in SFLP was less than the amount disbursed, $303,859.14. Then, Farhoud could have paid the funds to SFMI in repayment of his loans. No evidence was presented on Farhoud's basis in SFLP. Cai testified that she would probably have considered a payment from Farhoud to SFMI to be a loan repayment if the payment had come from Farhoud rather than SFLP. She testified that any loan repayment would have gone first to the older loans, not the 2012 loan.

D.    *Defendant's Audit Adjustments*

Defendant's auditor reclassified the $235,509 that Farhoud received from SFMI as a distribution rather than a loan. (Def's Ex P at 10.) Of that amount, the auditor found $223,508 was a capital gain to Farhoud based on his stock basis of $12,001. (*Id.*; *see also* Def's Ex C at 1.) Defendant's conference officer upheld that adjustment. (Def's Ex C.) Cai testified that she determined Farhoud received a distribution, not a loan, because there was no loan documentation, no interest charged, no maturity date, and no certificate of loan. She testified that she considered the 12 factors identified by the IRS for determining whether a payment was a loan or distribution. (*See* Def's Ltr, May 9, 2016.) Cai testified that Farhoud treated his

/ / /

/ / /

companies as his personal accounts and failed to observe any corporate formalities. She noted that SFMI's corporate bylaws prohibit loans to a director. (Def's Ex H at 2.[2])

Salti testified that Farhoud did not avoid taxes, he merely deferred them. He testified that he thought all of Farhoud's loans were "cleared up" as of 2015.

## II. ANALYSIS

The issue presented is whether $235,509 that Plaintiff Farhoud received from SFMI in 2012 was a loan or a distribution.

The Oregon Legislature intended to "[m]ake the Oregon personal income tax law identical in effect to the provisions of the Internal Revenue Code relating to the measurement of taxable income of individuals, estates and trusts, modified as necessary by the state's jurisdiction to tax and the revenue needs of the state[.]" ORS 316.007(1)[3]; *see also* ORS 314.736 ("A distribution of property made by an S corporation with respect to its stock shall be treated in the manner provided under section 1368 of the Internal Revenue Code, subject to modifications, additions and subtractions under ORS chapter 316, 317, or 318.").)

"In all proceedings before the judge or a magistrate of the tax court and upon appeal therefrom, a preponderance of the evidence shall suffice to sustain the burden of proof. The burden of proof shall fall upon the party seeking affirmative relief * * *." ORS 305.427. Plaintiffs must establish their claim "by a preponderance of the evidence[,]" which "means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof * * *." *Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990).

---

[2] SFMI's bylaws state that it "shall not lend money to or guarantee the obligation of a director of the corporation *unless*" one of two conditions is met. (Def's Ex H at 2 (emphasis added).)

[3] The court's references to the Oregon Revised Statutes (ORS) are to 2011.

Generally, under IRC section 1368(b)(2), a distribution of property by an S corporation results in "gain from the sale or exchange of property" to the extent that the distribution exceeds the basis of the stock. "The crucial concept in finding a constructive dividend is that the corporation conferred an economic benefit on the stockholder without expectation of repayment." *U.S. v. Smith*, 418 F2d 589, 593 (5th Cir 1969). A constructive dividend or distribution may arise when a corporation pays a shareholder's personal expenses. *See Dobbe v. Comm'r*, 61 Fed Appx 348, 350, WL 1507704 (9th Cir 2003). Farhoud contends that the funds he received from SFMI in 2012 were loans. Defendant determined that the funds were distributions and concluded that Farhoud realized a taxable gain of $223,508 for the 2012 tax year.

"A shareholder distribution is a loan, rather than a constructive dividend, if *at the time of its disbursement* the parties intended that it be repaid." *Crowley v. Comm'r (Crowley)*, 962 F2d 1077, 1079 (1st Cir 1992) (citations omitted) (emphasis in original); *see also Welch v. Comm'r (Welch)*, 204 F3d 1228, 1230 (9th Cir 2000). "Courts typically determine whether the requisite intent to repay was present by examining available objective evidence of the parties' intentions[.]" *Crowley*, 962 F2d at 1079. Courts "examine[] transactions between closely held corporations and their shareholders with special scrutiny." *Jones v. Comm'r (Jones)*, 74 TCM (CCH) 473, WL 595092 at *6 (1997), *aff'd* 177 F3d 983 (11th Cir 1999) (citations omitted); *see also Teymourian v. Comm'r (Teymourian)*, TC Mem 2005-232, WL 2464602 at *4 (2005).

To determine whether a loan was intended at the time of the disbursement, courts generally consider a nonexhaustive list of factors:

> "(1) The extent to which the shareholder controls the corporation, (2) the earnings and dividend history of the corporation, (3) the magnitude of the withdrawals and whether a ceiling existed to limit the amount the corporation advanced, (4) how the parties recorded the withdrawals on their books and records, (5) whether the

parties executed notes, (6) whether interest was paid or accrued, (7) whether security was given for the loan, (8) whether there was a set maturity date, (9) whether the corporation ever undertook to force repayment, (10) whether the shareholder was in a position to repay the withdrawals, and (11) whether there was any indication the shareholder attempted to repay withdrawals."

*Jones*, WL 595092 at *7, citing *Alterman Foods, Inc. v. United States (Alterman)*, 505 F2d 873, 877 n7 (5th Cir 1974). "Although these factors traditionally have been used in deciding whether distributions to a shareholder of a C corporation are loans or dividends, with the exception of the second factor, the factors are equally applicable to decide whether withdrawals by a shareholder of an S corporation are loans or distributions that must be included in gross income." *Jones*, WL 595092 at *7. "Since an S corporation's income is allocated to its shareholders when realized by the corporation, regardless of whether it is actually distributed to the shareholders, the second factor under *Alterman* * * *, which considers earnings and profits and dividend history, is not generally applicable to S corporations." *Id.* at n12.

A.      *The Extent to Which the Shareholder Controls the Corporation*

As noted above, transactions between closely held corporations and their shareholders require heightened scrutiny. *See id.* at *6. Farhoud was the sole shareholder of SFMI and exercised complete control over it. That factor weighs against Plaintiffs.

B.      *The Magnitude of the Withdrawals and Whether a Ceiling Existed to Limit the Amount the Corporation Advanced*

"[T]he absence of actual restraints" on the taxpayer's ability to withdraw funds from the corporation, especially in combination with "extraordinarily large withdrawals" from the corporation, tends to support a finding that the withdrawals were distributions rather than loans. *See Crowley*, 962 F2d at 1081. The funds Farhoud received from SFMI were substantial, particularly in light of SFMI's income. SFMI reported ordinary income of $38,323 in 2011 and

/ / /

$16,677 in 2012. By comparison, Farhoud received $235,509 from SFMI in the form of credit card charges for his personal expenses in 2012.

Cai noted that SFMI's bylaws include a restriction on loans to directors. However, in actual practice, no limit was imposed on Farhoud's ability to receive funds from SFMI. Indeed, at the start of the 2012 tax year, Farhoud reportedly owed SFMI $547,346.44. During 2012, Farhoud made numerous personal purchases with SFMI's credit cards, apparently without any consideration of the total amount of his charges. Farhoud enjoyed an open account with SFMI with no discernible limit. That factor weighs against Plaintiffs.

C.     *How the Parties Recorded the Withdrawals on Their Books and Records.*

The fact that the corporation recorded the withdrawals on its books and records as loans tends to support a finding that the withdrawals were loans. *Jones*, WL 595092 at *8. Plaintiffs documented the funds received by Farhoud as a loan in SFMI's books. That factor weighs in favor of Plaintiffs.

D.     *Whether the Parties Executed Notes.*

"Although customary loan documentation is not a prerequisite to a bona fide loan, * * * its absence unquestionably is relevant to the parties' intent." *Crowley*, 962 F2d at 1082. "The absence of a note or other loan documentation is indicative of a constructive dividend. * * * However, loans without documentation are not uncommon between a shareholder and a closely held corporation, and such documentation is not a prerequisite to finding that a loan exists." *Teymourian*, WL 2464602 at *5 (citations omitted). Farhoud did not execute a note with SFMI to document his claimed loan, even though he executed a note when he borrowed $200,000 from Khouri. That factor weighs against Plaintiffs, but is tempered somewhat by the fact that Farhoud is the sole shareholder of SFMI and would therefore have signed a note with himself.

E.    *Whether Interest was Paid or Accrued.*

"The payment of interest indicates the existence of a loan." *Teymourian*, WL 2464602 at *5 (citations omitted). No evidence was presented that Farhoud paid interest on his claimed loan or that any interest accrued.[4] That factor weighs against Plaintiffs.

F.    *Whether Security was Given for the Loan.*

No evidence was presented that Farhoud gave security for the claimed loan from SFMI. That factor weighs against Plaintiffs.

G.    *Whether There was a Set Maturity Date.*

No evidence was presented that Farhoud's claimed loan from SFMI had a maturity date. That factor weighs against Plaintiffs.

H.    *Whether the Corporation Ever Undertook to Force Repayment.*

No evidence was presented that SFMI sought to force Farhoud to repay the claimed loan. That factor weighs against Plaintiffs.

I.    *Whether the Shareholder was in a Position to Repay the Withdrawals.*

"A reasonable prospect of repayment indicates the existence of a loan. * * * A taxpayer's insolvency or financial difficulty casts doubt on the ability to repay and thus on the characterization of a disbursement as a loan." *Teymourian*, WL 2464602 at *6, citing *Welch*, 204 F3d at 1231. Farhoud testified that, in 2012, he was divorcing, struggling financially, and

---

[4] In their Complaint, Plaintiffs argued that Defendant failed to consider the imputed federal interest rate under IRC section 7872. (*See* Compl at 14.) Generally, IRC section 7872, "recharacterizes a below-market loan as an arm's-length transaction in which the lender makes a loan to the borrower in exchange for a note requiring the payment of interest at a statutory rate. As a result, the parties are treated as if the lender made a transfer of funds to the borrower and the borrower used these funds to pay interest to the lender. The transfer to the borrower is treated as a gift, dividend, contribution of capital, payment of compensation, or other payment depending on the substance of the transaction." *Weekend Warrior Trailers, Inc. v. Comm'r*, 101 TCM (CCH) 1506, WL 1900159 at *25 (2011). IRC section 7872 may apply to loans between a corporation and its shareholder. IRC § 7872(c)(1)(C). In that context, the imputed interest would result in a constructive dividend or distribution. *See Weekend Warrior Trailers*, WL 1900159 at *25. IRC section 7872 does not apply unless the transfer of funds was a below market loan. The court need not reach the question of interest under IRC section 7872 if the funds Farhoud received were not a loan.

worrying about losing his house. Under those circumstances, he charged expenses on SFMI's credit cards on an ongoing basis to meet his personal obligations. Farhoud's reported taxable income in 2012 was $73,414, which is not insignificant. However, it was considerably less than the amount he received from SFMI – $235,509 – and the amount he reportedly owed to SFMI – $547,346.44. In addition, either Farhoud or SFMI owed $174,000 to Khouri as of December 31, 2012, and the note required payment of the entire principal on May 1, 2013. The evidence presented indicates Farhoud was struggling financially in 2012 and owed a significant amount of money. That factor weighs against Plaintiffs.

J.      *Whether There was any Indication the Shareholder Attempted to Repay Withdrawals.*

Farhoud testified that, in 2012, he sought to refinance a property owned by SFLP in order to repay his loan to SFMI. Pearce confirmed Farhoud's testimony with respect to the timing of his efforts to refinance that property. Farhoud was finally able to refinance the property in October 2013, at which time $303,859.14 was transferred to SFMI. Cai noted that the funds from the refinance came from SFLP, not Farhoud. However, the parties agreed that – in substance – the refinance payment could be viewed as a distribution by SFLP to Farhoud and a contribution by Farhoud to SFMI.[5] Cai further noted that any repayment by Farhoud to SFMI would first be applied to his older loans. Given that Farhoud owed SFMI $547,346 at the beginning of the 2012 tax year, none of the $303,859.14 from SFLP would have repaid the funds Farhoud withdrew from SFMI in 2012. The transfer of funds in 2013 from SFLP to SFMI, perhaps on behalf of Farhoud, is not helpful to understanding Farhoud's intent in 2012. Farhoud

/ / /

---

[5] That transaction may have tax consequences for Farhoud in 2013, depending on his basis in SFLP. *See Menard, Inc. v. Comm'r*, 2004-207 TCM, WL 2066599 at *32 (2004), *rev'd in part on other grounds* 560 F3d 620 (7th Cir 2009) ("Transfers of property from one corporation to a related corporation may constitute a constructive dividend to the corporations' common shareholder whether or not the shareholder directly receives any property.")

may have intended to repay his earlier loans from SFMI or he may have intended to contribute funds to SFMI so that it could meet its obligations. That factor is inconclusive.

K.      *Loan vs. Distribution Conclusion*

The majority of the factors weighs against Plaintiffs and support a finding that Farhoud's receipt of funds from SFMI in 2012 was a distribution. Farhoud's testimony describing his state of mind in 2012 suggests that he needed money to meet his personal obligations and did not give consideration to the amount of money he took from SFMI or whether he would be able to repay it. Other than in SFMI's books, Farhoud took no steps to document the claimed loan or to establish its terms, such as an interest rate and maturity date. The evidence indicates Farhoud "simply used the corporation as his own personal pocketbook, depositing and withdrawing funds at will." *Jones*, WL 595092 at *8.

The court finds an aspect of this case worth discussing here: namely, the fact that Farhoud received funds through credit card charges by SFMI. According to SFMI's general ledger, the entirety of the $235,509 received by Farhoud was in the form of charges for his personal expenses on SFMI's credit cards. Presumably, those charges have been or will be repaid by SFMI. Farhoud may have co-signed for SFMI's credit cards, although no evidence to that effect was presented. Even assuming Farhoud co-signed for SFMI's credit cards, the debt is SFMI's.[6]

If Farhoud had charged his personal expenses to his own credit cards, he would not have realized any taxable gain. Instead, SFMI incurred the debt and Farhoud received the funds from SFMI. A transaction must "be given its tax effect in accord with what actually occurred and not

---

[6] In the context of determining shareholder basis, the federal "appellate courts have been nearly unanimous in concluding that when a shareholder guarantees a loan, the existence of the guarantee does not by itself increase the indebtedness of the S corporation to the shareholder." *Maloof v. Comm'r*, 456 F3d 645, 650 (6th Cir 2006). The taxpayer must make an actual "economic outlay," such as repayment of the corporation's debt. *Id.*

in accord with what might have occurred. * * * [W]hile a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not * * * and may not enjoy the benefit of some other route he might have chosen to follow but did not." *Don E. Williams Co. v. Comm'r*, 429 US 569, 579-80, 97 S Ct 850, 51 L Ed 2d 48 (1977) (internal quotation marks omitted). The court concludes it may not disregard the form of the transactions at issue and treat SFMI's credit card debt as belonging to Farhoud rather than SFMI, as of the 2012 tax year.

### III.  CONCLUSION

After careful consideration, the court concludes that the $235,509 Farhoud received from SFMI in 2012 was a distribution not a loan. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal is denied.

Dated this ____ day of September 2016.

_____
ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by* <u>mailing</u> *to: 1163 State Street, Salem, OR 97301-2563; or by* <u>hand delivery</u> *to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within* <u>60</u> *days after the date of the Final Decision or this Final Decision cannot be changed.  TCR-MD 19 B.*

*This document was filed and entered on September 29, 2016.*